SWIGGETT, PLAINTIFF AND APPELLEE, *v.* COLMORE ET AL.,
DEFENDANTS AND APPELLANTS.

## APPEAL from the District Court of San Juan in an Action for Damages.

No. 2391.—Decided March 7, 1922.

AGENCY — PROHIBITION — CONDUCT OF AGENT. — The rule laid down in *Silva Brothers & Co.* v. *Registrar of San Juan*, 28 P. R. R. 164, that "although an agent cannot acquire the property of his principal, this prohibition is to be construed strictly and if the principal himself sells the property to the agent the agency is understood to be revoked and the prohibition does not apply," is not absolute. The conduct of the agent is a decisive factor and if it can be concluded that he took advantage of the information obtained by him during the agency and procured its termination in order to profit personally on that information, without giving his principal the benefit of it, his action should not be recognized by the courts as a lawful source of right.

The facts are stated in the opinion.

*Mr. J. R. F. Savage* for the appellants.

*Mr. F. H. Dexter* for the appellee.

MR. CHIEF JUSTICE DEL TORO delivered the opinion of the court.

In this case the plaintiff sued for $2,770 damages on a certain option for the purchase of property with which the defendants failed to comply. The defendants admitted that they gave the option, but alleged that it was void and prayed to be absolved from the complaint with the costs against the plaintiff. Several questions of law were raised and disposed of and then the case was tried, the district court finally rendering judgment against the defendants. After referring to the pleadings of the parties the trial judge concluded his opinion as follows:

"The case was tried and documentary and parol evidence was examined from which it appears, in the opinion of the court, that at the outset the plaintiff, as a friend of the defendants, offered to assist them in making a sale of the property.

"The defendants desired that the property should be sold as a whole and for cash.

"On the 24th day of September the defendants gave to the

plaintiff the option, or promise to sell, in the belief that the plaintiff would make a profit of from one to two thousand dollars.

"While the contract was in full force and after the plaintiff had received an offer of $13,870 for the property, payable partly in cash and partly in instalments, which would have left him a profit of $2,770, the defendants revoked the option.

"We are of the opinion that there was no such error as that referred to in sections 1232 and 1233 of the Civil Code, and that neither the relation of friendship between the plaintiff and the defendants nor the relation that may have existed as between principal and agent is a cause for considering the contract invalid.

" 'Although an agent cannot acquire the property of his principal, this prohibition is to be construed strictly and if the principal himself sells the property to the agent the agency is understood to be revoked and the prohibition does not apply.' *Silva Brothers & Co.* v. *Registrar of San Juan,* 28 P. R. R. 164.

"Therefore, we are of the opinion that the complaint should be sustained and the defendants adjudged to pay to the plaintiff the sum of $2,770, with the costs and attorney fees."

The appellants assign eleven errors which they have fully and carefully argued. The appellee also discussed at length and carefully every question which he considered material. Because of the opinion which we have formed of the case, we shall not consider the first five assignments referring to "the demurrer" and to "the rulings during the trial" and shall analyze and dispose of the remaining assignments grouped in their brief under the heading of "errors in the judgment."

An examination of the pleadings and the evidence together justifies the following findings: The Domestic and Foreign Missionary Society of the Protestant Episcopal Church of the United States, one of the defendants, was the owner of a parcel of land in the ward of Bayola, Santurce, San Juan, P. R., of an area of 7,325 square meters, and the title was recorded in the registry of property in the name of the other defendant, Charles B. Colmore, Bishop of the said Protestant Episcopal Church.

The plaintiff testified that in May of 1918, in the office of the Home Missions in New York, he spoke with Dr. Gray, who asked his opinion about the purchase made by Bishop Colmore of the piece of land in question. The plaintiff replied that in his opinion the bishop had not made a bad bargain. The doctor asked him if he thought that $13,000 would be a good selling price for the property and the plaintiff answered that the price of a thing was never known until it was sold. Then the doctor asked him whether he would be willing to assist the bishop in selling the property "and I replied (to quote the plaintiff) that I would be very glad to help him and to do anything I could for the benefit of the church, as I always had done."

The plaintiff returned to Porto Rico. He and the bishop had several conferences and it was agreed to place a poster on the land offering the property for sale and referring prospective purchasers to Bishop Colmore or to Swiggett Brothers for information.

Some time elapsed. José Nieves, a broker, conferred with Bishop Colmore and offered to sell the property in small lots at the rate of $2.50 the square meter, free of expenses and commission. On September 21, 1918, Sebastián Moll said to the plaintiff that he was interested in purchasing the property and asked him to name a price. The plaintiff replied that Moll knew the value of properties in the Condado and asked him to make an offer in writing. Moll made him a written offer of $13,870. The offer is dated September 21, 1918, and Moll testified that it was delivered "two, three or four days thereafter." The plaintiff testified that he received it in the morning of the 25th of September.

In the afternoon of the 24th of September the plaintiff went to the house of defendant Colmore and there the following document was signed:

"San Juan, P. R., Sept. 24th, 1918.—It is hereby agreed that I, Chas. B. Colmore, on or before November 1st, 1918 will sign the

deed to the property situated in the Condado next to the Presby-
terian Hospital and bought by me from George D. Graves in favor
of R. S. Swiggett, in consideration of the price of Eleven Thousand
One Hundred Dollars.''

There is a contradiction in the evidence of the parties
regarding the circumstances which preceded the signing of
the document and which led the bishop to decide as he did.
The tendency of the evidence of the plaintiff is to show that
in the afternoon of the 24th he called on the bishop divested
of his character of adviser or agent to treat the matter as
a simple business transaction, stating that he hoped to make
a profit of from one to two thousand dollars, and that with
full knowledge of all this defendant Colmore signed the op-
tion.   On the contrary the evidence of the defendants tends
to represent the bishop as a man without experience in busi-
ness matters, hesitant as to what decision he should make,
anxious to do the best he could for the interests of his church
and fully confiding in the friendship and knowledge of the
plaintiff, and that he finally decided to sign the document
because the plaintiff advised him that the sale of the prop-
erty in lots would be delayed and involve the risk of selling
the best of them while the worst remained unsold; that there
was no prospective purchaser, and that the best thing for
the church would be to regain the money invested, which
would be accomplished exactly by the offer of $11,100 made
by the plaintiff for the land.   The said evidence admits that
the plaintiff spoke about making a profit of from one to two
thousand dollars, but indicates that he said that he would
have to wait for it for one or two years.

After the document was signed the plaintiff went home
and was immediately called over the telephone by the bishop
who told him that he wanted to think over the matter more
carefully and that he had acted very hastily.   The plaintiff
was displeased and called the bishop a little later and told
him that he was going to send him the document by a mes-

senger. The bishop told him to keep it and said that they could talk the matter over the next morning. The plaintiff in his testimony describes what occurred on the next day as follows:

"He came to my house in the morning and told me that he had made no decision in the matter and that he desired to speak with me again. I agreed that he might do so and said that 'within fifteen minutes I would take the trolley, because if I go to San Juan and sell this land you will do nothing but inconvenience me.' This conversation took place in my house at 9 o'clock in the morning of the day following the signing of the contract. I told him afterwards when he came to my house that morning, as I had told him the day before, that I was no longer an adviser because I was then a prospective purchaser. I had been in my store for two hours when Mr. Moll came in and offered me $13,870 for the property. He made the offer in writing. I told him that I could not accept the offer, but that if he would increase it, then I could come to an understanding with him. Then we went to La Mallorquina and while on our way we met Mr. Prieto, who went to see the bishop and told him *  *  * . This was on September 25, 1918. At 4 o'clock in the afternoon of that day the bishop came to see me and asked me whether I was going to hold him to the contract which he had signed the afternoon before. I asked him what he meant and he replied that Mr. Prieto had sold the property for $17,500. I replied that if this was true I would not oblige him to live up to the promise as regards the difference between this amount and the amount of my contract. Then he insisted that I should return the contract to him and I told him that I would if he gave me a check for $2,770, which was the difference between the price under the option that he gave me and the sum for which I could have sold the property to Mr. Moll on that same day, and that I was willing to waive the difference between the price I could have obtained from Mr. Moll and the price paid by the other purchaser."

Defendant Colmore's version is as follows:

"I went to his house in the morning and talked with him about the matter, the conversation being almost the same as that we had in afternoon of the day before. I went to his house about eight

o'clock. The plaintiff was dressing. What he said to me was not exactly what he had said the day before. There was some difference. That morning I remember he said that his position was then that of a purchaser instead of an adviser. I can not say positively that this was the first time that he had said so, but it was the first time that it was made very clear. I remember that he said on that day that during his conversation with Dr. Gray in New York Dr. Gray had said that the purchase of the property was unfortunate and that they wanted to get back their money; that this was the opportunity to do so, and that he thought that this was the best thing for me to do. I think that in these conversations the idea was expressed that it was not possible to sell the land in lots. I do not remember his exact words in this connection. The idea that I have in mind is that his advice was not to try to sell it in lots because the opportunity to do so was not offered. This second conversation took place in the morning of the 25th. The conversation concluded in an agreement to continue the option. Mr. Swiggett did not say that I had to decide within fifteen minutes. That afternoon at about four o'clock Mr. José Nieves Prieto called at my house. By reason of Nieves Prieto's visit I immediately went to Mr. Swiggett's store. I asked Mr. Swiggett whether he knew what Mr. José Nieves Prieto had said about what he could do in selling the land. I told Mr. Swiggett that the information I had from Mr. Nieves Prieto was that he had made a plan for dividing the land, had purchasers for it and had agreed to pay net $2.50 the meter. He made that offer the first time I spoke with him. The 25th was the first time I saw Mr. Nieves Prieto after the conversation that Mr. Nieves Prieto had with Mr. Swiggett in the latter's store in my presence. I immediately went to see Mr. Swiggett in the afternoon of the 25th. Mr. Swiggett was in his store. When I made these statements Mr. Swiggett asked me what I wished to do. I replied that I only wanted to know whether he was going to hold me to the option that I had given to him the night before. Mr. Swiggett thought for a moment and then said that he would not hold me to anything. Immediately after he said that a friend came up in his automobile and Mr. Swiggett said to me: 'I have an engagement with this friend and have to go out now, I will speak with you later.' "

There are two instants of decisive importance in this case —that when the option was signed and that when defendant

Colmore was in the store of the plaintiff in the afternoon of September 25th.

The district court does not analyze the evidence minutely in its opinion, but in holding that the option was valid it impliedly adjusted against the defendants the conflict as to the plaintiff's conduct and as to the plaintiff's relieving the defendants of their obligation. This being so, the judgment could be reversed only on proof that the court was influenced by passion, prejudice or partiality, or committed manifest error.

We are convinced that the court did not act with passion, prejudice or partiality, but, in our opinion, it plainly erred in weighing the evidence.

The court cited the jurisprudence laid down by this court in the case of *Silva Brothers & Co.* v. *Registrar of San Juan,* 28 P. R. R. 164, that "although an agent can not acquire the property of his principal, this prohibition is to be construed strictly and if the principal himself sells the property to the agent the agency is understood to be revoked and the prohibition does not apply."

Perhaps the absolute terms in which that doctrine is stated contributed to the error of the trial court. Perhaps the judge thought that as in this case it was the principal himself who sold the property directly to the agent, the prohibition was not applicable, without further consideration.

The rule is not absolute. The conduct of the agent is a decisive factor and if it can be concluded that he took advantage of the information obtained by him during the agency and procured its termination in order to profit personally by that information, his action should not be recognized by the courts as a lawful source of right.

There are many decisions of the American courts on this question. We shall quote only the summing up by Cyc. of those which we consider most pertinent in order not to extend this opinion unnecessarily.

"In accordance with the above rule, good faith and loyalty to the principal's interests require that an agent must not, except with his principal's full knowledge and consent, assume any duties or enter into any transaction concerning the subject-matter of the agency in which he has or represents interests adverse to those of his principal. If he does so the principal, when he acquires full knowledge of the facts may repudiate the transaction, without regard to whether the agent acted in bad faith, or whether the transaction resulted in a loss to the principal; or the principal may adopt the transaction and compel the agent to account for any profits made thereby. Nothing will defeat this right of the principal except his own confirmation after full knowledge of all the facts, and it does not matter that the agent was a mere volunteer agent, or that he was acting gratuitously. Nor is this rule affected by a custom or usage to the contrary of which the principal had no notice, actual or constructive." 31 Cyc. 1432–33.

"As a general rule an agent is not permitted to enter into any transaction with his principal on his own behalf respecting the subject-matter of the agency, unless he acts with entire good faith and without any undue influence or imposition, and makes a full disclosure of all the facts and circumstances attending the transaction. Since this rule, however, exists to protect the principal, it has no application to cases in which the agent openly and fairly deals with the principal, as in such cases an agent is as competent to deal with the principal as another. However, because of possible abuses of confidence and trust reposed in the agent, and of his commanding influence over the principal, and of the natural conflict of duty and interest in dealings between the principal and agent, the law views with suspicion, and scrutinizes closely, all dealings between them in the subject-matter of the agency, to see that the agent has dealt with the utmost good faith and fairness, and that he has given the principal the benefit of all his knowledge and skill, and if it appears that the agent has been guilty of any concealment or unfairness, or if he has taken any advantage of his confidential relation, the transaction will not be allowed to stand. It forms no exception to this rule that the agent had no authority to contract for his principal as to the subject-matter, but that he was merely employed to investigate or seek a person with whom the principal might deal." 31 Cyc. 1442–43.

"Loyalty to his principal's interests requires that an agent should make known to his principal every material fact concerning the subject-matter of his agency that comes to his knowledge or is in his memory in the course of his agency; and if he fails to do so he is liable in damages to his principal for any injury incurred or loss suffered in consequence of such failure, although it has been held that by so doing the agent makes the obligation or claim his own on which he is liable to the principal as the third person would have been." 31 Cyc. 1450-51.

In the opinion of this court in the case of *Ledesma et al.* v. *Agrait et al.,* 19 P. R. R. 541, 547, which involved the question of a sale made by a principal to his agent, the following was said:

"From these facts we do not doubt that Ledesma had all the material knowledge that was in the possession of his agent and that he ratified the sale if such ratification, considering the prohibited nature of the transaction, was in his power."

If we take at its full value the testimony of defendant Colmore, of his wife and of Charles Hartzell, it is evident that when on September 24, 1918, the plaintiff wanted to divest himself of the character of agent or adviser and to assume that of a purchaser, he did not give to defendant Colmore all of the information that he had, as was his duty. That same conclusion may be reached even by accepting the testimony of the plaintiff himself and analyzing it as a whole. On September 21st the plaintiff, acting as agent, received Moll's proposition. As agent he told Moll to make his offer in writing and to state the price that he was willing to pay. If on September 24th the plaintiff had informed Colmore of this fact, he would have given him an opportunity to inquire into the offer, and as Moll had written it on the 21st, is it not reasonable to believe that if Colmore had known of it and had been informed by it that Moll offered to pay $2,770 more than the plaintiff offered for the property, he would

not have signed the option on which the plaintiff bases his claim? How can we recognize in the plaintiff rights which emanate from his silence at a time when he should have spoken out clearly? It is Moll's offer, which was at least proposed, if not consummated, and not duly made known to the defendant while the plaintiff was his agent, on which the plaintiff relies for his claim of profits which he failed to receive.

From an examination of all of the evidence we believe that when defendant Colmore signed the option in question he did so under the impression created by the plaintiff's statements that the latter's offer was the best that could be obtained in the interest of the church at that time, and that if the plaintiff could make any profit, it would be at the end of a period of one or two years and under the necessity of borrowing money. We are of the opinion also that on September 24th the plaintiff did not mention to defendant Colmore the name of Moll, nor the offer received from him while acting as the defendant's agent.

The intendment of the law is to sanction lawful transactions, to insure the proper performance of contracts, to reward labor and intelligence and the courage and determination which often imply the assumption of risk; but in no manner to aid those who in pursuit of their purposes assume attitudes contrary to their own previously contracted obligations. The first and principal duty of the plaintiff in this case was towards the defendants. Only by completely discharging his trust as to them and after they had received the full benefit of the information acquired and the opportunities offered, could a new relation have originated. Perhaps the plaintiff believed that he was acting correctly. Perhaps he thought that it was sufficient to inform the defendants on the 24th of September that from that time he was no longer an adviser. But we have seen that in accordance

with the law and jurisprudence this is not sufficient. It has been said that friendship and confidence are one thing and business is another. It is true that the expectation of making a profit is the principal inspiration of business relations; but the only profits that can be recognized by a well organized social system like our own are those which are based on fair transactions; that is, those in which each party is assured of what is his, and in this case Moll's offer was virtually made to the defendants and not to the plaintiff. In order that the plaintiff could have built the structure of his claim on Moll's offer he should have communicated it first to his principal and if his principal declined it and with full knowledge of the circumstances decided to contract with the plaintiff, then he would have built upon a rock and not upon the sand, as he did in this case.

In these circumstances the judgment appealed from must be reversed and it is not necessary to consider the evidence regarding the second of the two instants which we have classified as decisive of the case. We refer to the time when, according to defendant Colmore, he asked the plaintiff in the afternoon of September 25th whether he was going to hold him to the option and received an unconditional negative reply, and when, according to the plaintiff, what passed was that he agreed not to force the performance of the contract if payment was made to him of the profit which he had then made from Moll's offer, or $2,770.

The appeal is sustained, the judgment appealed from is reversed and substituted by another judgment dismissing the complaint without special imposition of costs.

*Reversed.*

Justices Wolf, Aldrey and Hutchison concurred.